**FILED**

**July 26, 2017**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time 9:26 AM**



## TENNESSE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT CHATTANOOGA

| | | |
|---|---|---|
| DeWayne Burnette, Sr.,<br>　　　　Employee, | ) | Docket No.: 2016-01-0670 |
| v. | ) | |
| Westrock Company,<br>　　　　Employer, | ) | State File No.: 87860-2016 |
| And | ) | |
| AGRI General Insurance Co.,<br>　　　　Insurance Carrier. | ) | Judge Thomas Wyatt |
| | ) | |

## EXPEDITED HEARING ORDER FOR MEDICAL AND TEMPORARY TOTAL DISABILITY BENEFITS

This matter came before the Court on July 17, 2017[1], for an Expedited Hearing in which DeWayne Burnette, Sr. sought temporary disability and medical benefits, attorney's fees, and penalties for a heat-related injury. The primary issues before the Court were: (1) whether Mr. Burnette gave Westrock timely notice of his injury; and (2) whether he established that his injury arose primarily out of and in the course and scope of employment. For the reasons set forth below, the Court holds Mr. Burnette is entitled to some of the benefits requested.

### History of Claim

Mr. Burnette is a sixty-year-old employee of Westrock's corrugated box plant in Chattanooga, Tennessee. On July 8, 2016, Mr. Burnette worked the 3:00 p.m. to 11:00 p.m. shift in an area of the plant without air-conditioning. He estimated that the

---

[1] The Court conducted the in-court hearing on July 10, 2017, but allowed the parties until July 17 to brief an evidentiary issue.

temperature in his work area exceeded 100 degrees.[2] During his shift, Mr. Burnette claims he became ill due to exposure to heat on the job. After his shift ended, he sought emergency care that led to his admission to the ICU for complications caused by renal failure.

Before his injury, Mr. Burnette took prescribed medication to control hypertension and type II diabetes. Mr. Burnette had nearly perfect attendance during his twelve-year tenure at Westrock, a fact his supervisor, Corey Reese, confirmed. Although the emergency room records indicated Mr. Burnette said he had not felt well for a week prior to July 8, he only missed work during that period when Westrock closed for the Fourth of July holiday.

Returning to the events of July 8, Mr. Burnette began experiencing weakness and dizziness about two to three hours into his shift. Co-worker Robert Tate reported to Mr. Reese that Mr. Burnette was pale and overheated. When Mr. Reese came to the scene, Mr. Burnette told him the heat in his work area was making him sick. Mr. Reese concluded that Mr. Burnette was overheated and dehydrated and took him to an air-conditioned office for a bottle of cold water.

Mr. Reese testified he gave fluids to Mr. Burnette because his work area was hot and he recognized the peril of working in a hot environment. Mr. Reese stated he, himself, sweated profusely while just standing in the plant during hot weather and, at times, felt the need to rest while performing physical activities in hot areas of the plant. He stated he routinely placed containers of water near every work station during hot weather and, during safety meetings, instructed his employees to stay hydrated and work slowly when encountering hot conditions.

Following Mr. Reece's instruction, Mr. Burnette left the plant floor, drank water, and did not return to work until after his 6:00 p.m. lunch break. Shortly thereafter, another co-worker reported to Mr. Reese that Mr. Burnette was overheated. Mr. Reese again took Mr. Burnette to a cool location, but this time reported Mr. Burnette's condition to the plant manager.[3] Based on that conversation, Mr. Reese again gave Mr. Burnette fluids to drink.

---

[2] Mr. Burnette testified the thermometer in his car registered 90 degrees when he arrived at work, and the temperature in the plant was higher than the outside temperature. Westrock's supervisor testified that the inside temperature at the plant during hot weather was approximately five to ten degrees hotter than the outside temperature.

[3] Mr. Reese testified Westrock provided no health care provider on-site to address employees' health needs. He stated Westrock's policy required him to contact upper management about any employee's health conditions that arose during the shift and, if his supervisors decided an employee needed medical attention, one of them would come to the plant to transport the employee for medical care.

2

Around 7:50 p.m., Mr. Burnette called his son, DeWayne Burnette, Jr., to come to the plant to transport him for medical care. Mr. Burnette, Jr. arrived around 8:20 p.m. and observed that his father was "sweating repulsively" and shaking. Mr. Burnette, Sr. told Mr. Reese he wanted to seek medical attention, but Mr. Reese refused the request upon instructions from upper management. Mr. Reese then asked Mr. Burnette, Jr. to leave the plant, which he did.

Mr. Burnette, Jr. re-entered the plant at 11:00 p.m. to check on his father. He again found his father sweating heavily and shaking. Although the shift was over, Mr. Reese still would not permit Mr. Burnette, Sr. to leave, explaining his supervisor had instructed him to keep Mr. Burnette, Sr. on site for an additional thirty minutes to make sure it was safe for him to leave. Upon hearing this, Mr. Burnette, Jr. became agitated and verbally demanded that Mr. Reese allow his father to leave. Mr. Burnette, Sr. also asked Mr. Reese to release him, explaining that he was not improving and needed to go to the hospital for treatment. Mr. Reese expressed concern that he could lose his job if he did not follow his supervisor's instructions to keep Mr. Burnette, Sr. on site. Mr. Burnette, Jr. stated Mr. Reese told his father that he, too, could lose his job if he left without permission. Mr. Burnette, Jr. recorded this conversation on his cell phone.

Mr. Reese allowed Mr. Burnette, Sr. to leave a few minutes before 11:30 p.m. By this point, Mr. Burnette could not walk and had to exit the premises by draping his arms around Mr. Reese's and his son's shoulders so they could bear most of his weight. Other Westrock employees helped Mr. Burnette into his son's vehicle.

Mr. Reese testified on multiple occasions he acted on his supervisor's instructions in keeping Mr. Burnette at the plant. He admitted he did not have sufficient training to make decisions about medical matters and stated he wished his supervisors had come to the plant to personally assess Mr. Burnette's condition. Additionally, Mr. Reese testified he allowed another employee to go home on July 8 due to illness, explaining that his supervisors authorized him to do so because that employee had a stomach bug that he caught at home.[4]

Mr. Burnette, Jr. rushed his father to the Memorial Hospital emergency room after leaving Westrock. The attending physician diagnosed Mr. Burnette, Sr. with several medical complications related to total renal failure and admitted him to the cardiovascular

---

[4] Mr. Burnette contends Westrock's decision to keep him on site proves he reported his condition to Westrock as a work-related injury. Mr. Burnette asserts the motivation for keeping him on-site until the shift ended was upper management's desire to maintain a long streak of days without a reported work injury.

3

ICU for treatment and observation of a reduced heart rate caused by increased levels of potassium[5] and other chemicals in his system.

Mr. Burnette remained hospitalized four days, receiving treatment including dialysis and IV administration of insulin.[6] By the time of his release from the hospital, his kidneys were again functioning and his blood work indicated near normal chemical levels. (Ex. 3 at 46-47.) The Discharge Report from Memorial indicated "he probably should remain out of work until his creatinine level returns to normal before subject[ing] himself to the hot environment at work again." *Id.* at 45.

Dr. Joseph Watlington, a nephrologist, treated Mr. Burnette in the hospital. He diagnosed Mr. Burnette with "[a]cute kidney injury, multifactorial, heat prostration, dehydration, rhabdomyolysis, may be some chronic renal insufficiency, also do not know that could be fact and possibly aggravated by medications." (Ex. 3 at 24.) Dr. Watlington also diagnosed Mr. Burnette with diabetes mellitus type 2, hypertension, hyperkalemia thought to be secondary to rhabdomyolysis, and acidosis. Dr. Watlington felt the rhabdomyolysis was due to heat prostration and aggravated by acute renal failure.[7] *Id.*

Mr. Burnette saw his personal physician, Dr. Philip Bannor, on September 15 for post-hospitalization kidney care. (Ex. 16 at 150.) Dr. Bannor diagnosed him with heat stroke, extreme dehydration, rhabdomyolysis, acute kidney damage, and hyperkalemia. *Id.* at 153. He concluded that Mr. Burnette needed "continuous relief from all job requirements" and stated that Mr. Burnette's renal injuries "are due to work related harsh conditions; extreme temperature; and management refusal to seek immediate medical attention." *Id.* at 154.

Mr. Burnette also remained under Dr. Watlington's care after his release from the hospital. On January 9, 2017, Dr. Watlington noted Mr. Burnette's creatinine levels had returned to normal and ordered physical therapy "to document he has recovered from this serious muscle injury [rhabdomyolysis]." (Ex. 5 at 17-18.) Additionally, Dr. Watlington

---

[5] The records documenting Mr. Burnette's treatment by general practitioner Dr. Philip Bannor contain reports of blood work performed September 10, 2015, indicating Mr. Burnette had a normal potassium reading of 4.5. (Ex. 4 at 27.) The July 9, 2016 blood work at Memorial Hospital indicated a potassium reading of 9. (Ex. 3 at 6.) Dr. Bannor wrote in his September 15, 2016 report that a potassium level of 9 was "[o]ver the LETHAL DOSE of 8.5." (Ex. 16 at 153.)

[6] Mr. Reese testified he came to the hospital while Mr. Burnette was in the ICU. He stated he brought Mr. Burnette some Gatorade, explaining he did not want Mr. Burnette to suffer dehydration while in the hospital.

[7] The internet webpage *WebMD* (June 26, 2017) defines hyperkalemia as a condition characterized by a sufficiently high level of potassium in the blood to cause a risk of a dangerous change in heart rhythm. *WebMD* defines rhabdomyolysis as a discharge of the content of dead muscle fibers into the bloodstream.

4

stated he would "release [Mr. Burnette] to PT [to] attempt to regain strength lost while recovering from Rhabdo."[8] *Id.* at 18.

Because he was unable to work due to his kidney injury, Mr. Burnette signed up for short-term disability benefits shortly after he got out of the hospital. He testified he filed for STD benefits because he received a letter from Westrock instructing that he do so. Mr. Burnette received STD benefits for six months.

The evidence submitted during the hearing did not fully explain what, if any, steps the parties took on Mr. Burnette's workers' compensation claim during the weeks immediately following his release from the hospital. Westrock submitted a First Report of Injury indicating it did not receive notice of Mr. Burnette's injury until November 2016. Westrock's carrier denied the claim almost immediately upon receiving, citing the ground that Mr. Burnette's kidney condition was a personal health condition. (Ex. 12.) Westrock did not raise its notice defense until Mr. Burnette placed his claim in litigation.

Mr. Burnette pursued his workers' compensation claim by filing a Petition for Benefit Determination and requesting this hearing. He submitted causation questionnaires signed by Drs. Watlington and Bannor in support of his claim. Dr. Watlington responded in his questionnaire that Mr. Burnette's exposure to heat at work on July 8 caused sweating that resulted in constriction of the volume of fluid in his body and led to acute renal failure, requiring hospitalization. He also noted that Mr. Burnette's exposure to heat on the job primarily caused the medical conditions that necessitated his hospitalization on July 9. (Ex. 14.)

Dr. Bannor's questionnaire contained the opinion that Mr. Burnette's exposure to heat on the job caused "100% acute renal failure" that necessitated his immediate hospitalization for dialysis. (Ex. 15.) Dr. Bannor also wrote that the rhabdomyolysis Mr. Burnette experienced following his renal failure was heat-related. Finally, he stated Mr. Burnette's renal conditions totally disabled from working from July 9 "until [he is] released to work or determine disability." *Id.*

Westrock defended Mr. Burnette's claim by submitting the written statement of Dr. J. Harold Helderman, the Director of the Transplant Center at Vanderbilt Hospital.[9] Dr. Helderman did not examine Mr. Burnette in person but instead formulated his impressions after reviewing the records documenting Mr. Burnette's treatment. (Ex. 1 at 1.) Dr. Helderman agreed with the diagnoses made by Dr. Watlington but listed Mr.

---

[8] Mr. Burnette has not undergone the physical therapy ordered by Dr. Watlington. He testified during the Expedited Hearing that he felt he could return to his normal job at Westrock if he underwent the physical therapy to rebuild his strength.

[9] Dr. Helderman signed his report on June 23, 2017. (Ex. 1A at 3.) Accordingly, it does not appear Westrock based its denial of Mr. Burnette's claim on Dr. Helderman's report.

Burnette's use of the drug Gemfibrozile and overheating through exertion as possible causes for his rhabdomyolysis. *Id.* at 2. Dr. Helderman also wrote that Mr. Burnette's use of the drug Metaformin possibly caused his metabolic acidosis and hyperkalemia. *Id.* In explanation of his opinions, Dr. Helderman wrote:

> It is impossible to say to a reasonable degree of medical certainty the primary cause of Mr. Burnette's rhabdomyolysis, renal failure, metabolic acidosis, and hyperkalemia. It is impossible to say to a reasonable degree of medical certainty that Mr. Burnette's work was the primary cause of the rhabdomyolysis, renal failure, metabolic acidosis, or hyperkalemia when you consider all other causes. There is no way to accurately assess, to a reasonable degree of medical certainty, the primary cause of Mr. Burnette's condition presented on July 8, 2016.

(Ex. 1 at 2.) (Internal paragraphing omitted from quotation.)

Dr. Helderman also stated the opinion that Mr. Burnette had recovered from his heat-related conditions by the time of his release from the hospital. He concluded Mr. Burnette could have returned to work without restrictions approximately one week following his renal failure and stated that physical therapy does not constitute a reasonable treatment for Mr. Burnette's conditions. *Id.* at 2-3.

During the hearing, Mr. Burnette sought to introduce the recording his son made of the conversation with Mr. Reese after his shift ended on July 8. Mr. Burnette sought to use the recording to rebut Mr. Reese's previous testimony that he did not threaten Mr. Burnette's job if he left Westrock without permission on July 8. Mr. Burnette did not divulge the existence of the recording before he attempted to use it for rebuttal, either by identifying it in his discovery responses or by filing it with the clerk in advance of the hearing.

Mr. Burnette's counsel contended that using the recording as rebuttal evidence exempted his obligation to divulge the existence of the recording prior to the hearing. Counsel for Westrock objected to the introduction of the recording because (1) Mr. Burnette had an obligation to give notice of the existence of the recording prior to the hearing; and (2) Mr. Burnette failed to lay a proper foundation for the introduction of the recording while Mr. Reese was on the stand.[10]

The Court allowed Mr. Burnette, Jr. to play the recording from his telephone for identification purposes only, pending the parties' opportunity to brief the issue on or before July 17, 2017. Both parties timely filed their briefs on this issue.

---

[10] Mr. Reese was available on-site to return to the stand to testify regarding the statements he made during the recorded conversation. Westrock did not recall him to the stand.

6

**Findings of Fact and Conclusions of Law**

*General Legal Principles*

Mr. Burnette bears the burden of proving all essential elements of his claim, but he need not prove every element of the claim by a preponderance of the evidence at an expedited hearing. Rather, Mr. Burnette must come forward with sufficient evidence from which the Court can determine that he is likely to prevail in establishing the necessary elements of his or her claim at a hearing on the merits. *See McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015).

*Preliminary Evidentiary Issue*

Mr. Burnette's attempt to use his son's recording to rebut Mr. Reese's testimony created a complicated evidentiary issue that pitted Westrock's right to discover information relevant to its defense against Mr. Burnette's strategical decision to use a secretly-recorded conversation to rebut a witness's previous testimony. Westrock's request for production of documents and other tangible items requested that Mr. Burnette produce a "copy of any and all statements, whether sworn to or not, by any representative or employee of [Westrock] involving the circumstances surrounding the accident at issue." (T.R. 13 at 6.) Mr. Burnette responded that he had "no document(s) in my possession that are responsive to this request."

In deciding this issue, the Court will apply the following framework set forth in *Strickland v. Strickland,* 618 S.W.2d 496, 499 (Tenn. Ct. App. 1981):

> Generally, where a party has not given the name of a person with knowledge of a discoverable matter, the court should consider the explanation given for the failure to name the witness, the importance of the testimony of the witness, the need for time to prepare to meet the testimony, and the possibility of a continuance. In the light of these considerations, the court may permit the witness to testify, or it may exclude the testimony, or it may grant a continuance[.][11]

The Court first notes that Tennessee Compilation Rules and Regulations 0800-02-21-.14(1)(c) (Nov. 2016), explicitly exempts a party's duty to file evidence with the court clerk before a hearing when the "witnesses or evidence [are] intended for impeachment or rebuttal purposes." However, the above rule does not fully resolve the inquiry here because Westrock engaged in discovery prior to the hearing. Mr. Burnette's response about not having a "document" may have been technically true, but it was not entirely

---

[11] The Court considers the principles set forth in the quotation to equally apply to a recording that a party did not divulge in response to a clear request in discovery that the party do so.

responsive to the discovery request, which was not limited in scope to only written statements.

In the Court's mind, the strategy of using the recording as rebuttal evidence does not supersede the obligation to accurately respond to discovery requests. Mr. Burnette's disclosure of the recording in discovery would not have obviated his effective use of the recording to impeach Mr. Reese's testimony at trial had he determined the need to do so. Accordingly, the Court sustains Westrock's objection to the admissibility of the recording as evidence in this hearing.

Westrock requested that the Court dismiss Mr. Burnette's claim to sanction him for his inaccurate discovery response. The Court declines to do so and considers its decision to exclude the recording as evidence to constitute sufficient sanction under the facts and circumstances existing here. *See generally,* Tenn. R. Civ. P. 37.02(B) (2016).

*Notice*

Westrock contends Mr. Burnette failed to provide statutory notice because he did not explicitly tell Mr. Reese that the symptoms he experienced on July 8 were work-related. Further, it argues Mr. Burnette implicitly communicated that his renal injury was not work-related when he signed up for STD benefits. Mr. Burnette counters that Westrock's supervisor, Mr. Reese, had actual notice of his injury on the date it occurred, thus Westrock had more than adequate notice to satisfy the applicable statutory requirement.

Tennessee Code Annotated section 50-6-201(a)(1) (2016) provides that "[e]very injured employee . . . shall, immediately upon the occurrence of an injury, or as soon thereafter as is reasonable and practicable, give or cause to be given to the employer *who has no actual notice*, written notice of the injury[.] (Emphasis added.) If the situation warrants written notice, then notice "shall be given personally to the employer or to the employer's agents having charge of the business at which the injury was sustained by the employee." Tenn. Code Ann. § 50-6-201(a)(4) (2016). It stands to reason that the same person or persons who can receive written notice of a work injury can also have actual notice that renders a work injury compensable.

Here, Mr. Reese knew of the potential peril of working in the hot conditions in Westrock's plant. He testified he knew Mr. Burnette's work area was hot on July 8 and stated he received multiple reports that Mr. Burnette had become overheated while working in those conditions. Mr. Reese personally observed Mr. Burnette's heat-related symptoms and twice determined Mr. Burnette needed to go to a cooler area of the plant and consume fluids because he was overheated and dehydrated Mr. Reese observed Mr. Burnette's condition worsen over a six-hour period to the point Mr. Burnette could not walk from the plant without assistance after his shift ended. Mr. Reese made multiple telephone calls to Westrock's upper management to obtain instructions on what to do

8

about Mr. Reese's condition, including communicating Mr. Burnette's request to leave and obtain medical treatment. Mr. Burnette surmised that Mr. Burnette's hospitalization was for heat-related symptoms because he took Gatorade to him when he attempted to visit Mr. Burnette in the hospital.

After considering the above facts in application to the applicable law, the Court holds that, at a hearing on the merits, Mr. Burnette will likely prevail in establishing that Westrock had actual notice of the heat-related symptoms he experienced while working in hot conditions in Westrock's plant on July 8, 2016. Accordingly, the Court denies Westrock's notice defense.

*Causation*

In order to recover benefits, Mr. Burnette must prove he either suffered an "injury" or contracted an "occupational disease" as the Workers' Compensation Law defines those terms. The workers' compensation statute defines a compensable injury as one occurring "by accident . . . arising primarily out of and in the course and scope of employment, that causes death, disablement, or the need for medical treatment of the employee[.]" "An injury arises primarily out of and in the course and scope of employment only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes[.]" Finally, Mr. Burnette must establish the work-relatedness of his claim by "a reasonable degree of medical certainty." Tenn. Code Ann. § 50-6-102(14) (2016).

The 2013 reforms to the Workers' Compensation Law repealed the separate standard employed under the previous statute to determine whether an employee could recover for contracting an occupational disease. In its place, the reform act enacted the following language codified at Tennessee Code Annotated section 50-6-303(a)(1) (2016):

> . . . the partial or total incapacity for work or the death of an employee resulting from an occupational disease . . . shall be treated as the happening of an injury by accident . . . and the employee . . . shall be entitled to compensation as provided in this chapter.

Accordingly, the above-quoted statutory definitions and evidentiary standards applicable to work-related injuries apply to occupational diseases.

The evidence introduced during the hearing left little doubt that Mr. Burnette became ill while working in hot conditions at Westrock on July 8, 2016. The primary issue is whether the conditions that caused the symptoms Mr. Burnette encountered at work arose primarily out of and in the course and scope of employment. To determine this issue, the Court must select between competing medical opinions on the causation of Mr. Burnette's injury.

9

In *Venable v. Superior Essex, Inc.*, 2016 TN Wrk. Comp. App. Bd. LEXIS 56, at *7-8 (Nov. 2, 2016), the Appeals Board discussed as follows the Court's inquiry when called on to select between competing medical opinions on causation in deciding a claim:

> In evaluating expert medical opinions, a trial judge may consider, among other things, the qualifications of the experts, the circumstances of their evaluation, the information available to them, and the evaluation of the importance of that information by other experts. . . As stated by the Tennessee Supreme Court, "[w]hen faced . . . with conflicting medical testimony . . ., it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation."

(Internal citations omitted.)

In considering the causation opinions of Drs. Watlington, Bannor and Helderman, the Court notes Dr. Helderman neither treated nor examined Mr. Burnette in person. Accordingly, the Court finds that Drs. Watlington and Bannor occupy more advantageous positions than Dr. Helderman to consider which causative factor primarily caused Mr. Burnette's kidney injury. While Dr. Helderman is eminently qualified in his field of practice, Dr. Watlington, who is a kidney specialist like Dr. Helderman, and Dr. Bannor are both possess the qualifications necessary to provide causation opinions in a workers' compensation claim. In support of the above assessment, the Court notes that the statutory requirement for one giving a causation opinion is that the giver of the opinion be a "physician," a credential possessed by both Drs. Watlington and Bannor, as well as by Dr. Helderman. Tenn. Code Ann. § 50-6-102(14)(E) (2016). Here, the Court gives more weight to the causation opinions of Drs. Watlington and Bannor because they actually treated Mr. Burnette's renal injury.

Additionally, the Court adopts Drs. Watlington's and Bannor's opinions because Dr. Helderman did not give a causation opinion, but only offered instead the following reason why he believed he could not give an opinion: "[t]here is no way to accurately assess, to a reasonable degree of medical certainty, the primary cause of Mr. Burnette's condition presented on July 8, 2016." The Court considers Dr. Helderman's statement as his declaration that medical science offers no basis to accurately assess which, if any, competing causative factors constitutes greater than fifty percent of the causation of Mr. Burnette's kidney condition. While the Court appreciates this statement, it is of little practical value in determining the parties' current dispute. The Court, therefore, looks to the opinions of the treating physicians in rendering its decision. *See* Tenn. Code Ann. § 50-6-102(14)(D) (2016), which provides "'[s]hown to a reasonable degree of medical certainty' means that, *in the opinion of the physician,* it is more likely than not considering all causes, as opposed to speculation or possibility." (Emphasis added.)

10

Accordingly, the Court holds that Mr. Burnette will likely prevail at a hearing on the merits in establishing by medical expert opinion that his renal failure, and its attendant medical complications, arose primarily out of and in the course and scope of his exposure to hot conditions while working at Westrock on July 8, 2016.

## Medical Benefits

Tennessee Code Annotated section 50-6-204(a)(1)(A) (2016) requires that an employer provide an injured employee medical treatment of a compensable injury. Ordinarily, the employer may require an employee to select a treating physician from a panel, but "an employer who elects to deny a claim runs the risk that it will be held responsible for medical benefits obtained from a medical provider of the employee's choice[.]" *See McCord,* 2015 TN Wrk. Comp. App. Bd. LEXIS 6 at *14.

The Court's holding that Mr. Burnette will likely prevail in establishing the compensability of his injury implicitly includes a finding that Westrock is liable for the cost of reasonable and necessary treatment of the compensable condition. A review of the evidence convinces the Court that Mr. Burnette will likely prevail at trial in establishing that the kidney-related treatment he received at, and adjunct to, his hospitalization at Memorial Hospital, as well as his post-hospitalization treatment by Drs. Watlington and Bannor, arose primarily out of and in the course and scope of employment. As such, Westrock is liable to pay the charges for said treatment upon proper presentment of the charges by the providers who rendered the treatment.

During the hearing, Mr. Burnette asked the Court to order reimbursement of the out-of-pocket expenses he incurred in obtaining treatment of his heat-related symptoms. However, he did not come forward with any evidence to substantiate the charges he paid out-of-pocket. Accordingly, at this time the Court denies Mr. Burnette's claim for payment of out-of-pocket medical expenses.

Also implicit in the Court's holding here is that Westrock must provide future treatment of Mr. Burnette's kidney injury. The Court holds that Westrock shall authorize Drs. Watlington and Bannor to provide future reasonable and necessary treatment.

## Temporary Total Disability Benefits

In *Shepherd v. Haren Construction Company, Inc.,* 2016 TN Wrk. Comp. App. Bd. LEXIS 15, at *13 (March 30, 2016), the Workers' Compensation Appeals Board set forth the following elements an employee must prove to obtain temporary total disability (TTD) benefits: "(1) total disability from working as the result of a compensable injury; (2) a causal connection between the injury and the inability to work; and (3) the duration of the period of disability." After applying the evidence to the elements set forth above,

11

the Court holds that Mr. Burnette will likely prevail at a hearing on the merits in establishing his entitlement to TTD benefits for a portion of the period he has missed from work since the date of injury.

Looking at the evidence relevant to the TTD issue, the first medical determination of Mr. Burnette's ability to return to work following his kidney injury was that of the physician who discharged him from Memorial Hospital on July 13, 2016. This physician suggested that Mr. Burnette not return to work in a hot environment until his creatinine level returned to normal. However, Mr. Burnette did not return to work after his release from the hospital but filed for and received STD benefits. Mr. Burnette did not present the Court with the medical evidence upon which he supported his claim for short-term disability benefits; accordingly, the Court had no medical evidence to support an award of TTD benefits for the weeks immediately following his release from the hospital.

Dr. Bannor's report of September 15, 2016, constituted the earliest medical evidence establishing that Mr. Burnette's renal condition totally disabled him from working. (Ex. 16 at 153.) Dr. Bannor's causation questionnaire provided that Mr. Burnett should not return to work until a physician releases him. On January 9, 2017, Dr. Watlington ordered physical therapy to determine if Mr. Burnette had recovered from the rhabdomyolysis he suffered due to his renal failure. (Ex. 16 at 138, 140.) However, Mr. Burnette has not undergone the physical therapy prescribed by Dr. Watlington.

In view of the above, the Court finds that Mr. Burnette will likely prevail at trial in establishing entitlement to a period of temporary total disability benefits beginning September 15, 2016. Mr. Burnette's entitlement to TTD benefits shall continue until a treating physician releases him to return to work.[12]

The Court is mindful that Dr. Helderman stated in his report that Mr. Burnette should be able to return to work without restrictions a week after he suffered his episode of renal failure. However, the Court gives little weight to Dr. Helderman's opinion because he did not treat Mr. Burnette and he rendered his opinion without ever personally examining Mr. Burnette.

Finally, the Court rejects Westrock's argument that Tennessee Code Annotated section 50-6-207(1)(E) (2016) mandates denial of Mr. Burnette's claim to TTD benefits. This statute conclusively presumes the date of maximum medical improvement to coincide with the date the active treatment of a compensable injury ends. Here, Dr. Watlington has ordered active treatment of Mr. Burnette's compensable injury—physical therapy—that has not yet taken place. For that reason, section 50-6-207(1)(E) is inapplicable here.

---

[12] The parties stipulated the applicable compensation rate for TTD benefits is $488.35 per week.

12

*Attorney's Fees and Penalties*

Counsel for Mr. Burnette seeks an order requiring Westrock to pay her attorney's fees for successfully prosecuting this claim through this stage. She cites Tennessee Code Annotated section 50-6-226(d)(1)(B) (2016) as statutory authority for an award of attorney's fees.

In *Andrews v. Yates Services, Inc.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 35, at *7-8 (May 23, 2017), the Workers' Compensation Appeals Board discouraged consideration of the award of attorney's fees under the above statute until the end of the claim. Specifically, the Appeals Board held,

> Given the twists and turns inherent in litigation, it seems the better practice is to resolve such issues after the litigation has run its course and the parties and the court no longer face uncertainties over future developments, as opposed to adjudicating disputes concerning attorney's fees and expenses in piecemeal fashion as the case winds its way through the litigation process. Thus, we conclude that the trial court's resolution of the attorney's fees and expenses issue was, at this early juncture in the case, premature.

The Court will follow the admonition of the Appeals Board here. Should counsel for Mr. Burnette seek an award of a contingency fee from the benefits awarded herein, she should petition the Court to approve her requested fee. Her petition should include a copy of the contract Mr. Burnette signed to engage her as counsel and a description of the time she spent in prosecuting this matter thus far.

The Court considers that the principle from the *Andrews* opinion equally applies to Mr. Burnette's request for penalties against Westrock. Accordingly, at this time, the Court will not consider whether it should impose penalties in this claim. However, the Court will refer this matter to the Bureau's penalty division for determination of any penalties the Bureau unit deems appropriate.

**IT IS, THEREFORE, ORDERED** as follows:

1. Westrock and/or its carrier shall pay Mr. Burnette accrued temporary total disability benefits in the amount of $488.35 per week from September 15, 2016, until July 28, 2017, (a period of forty-five weeks, two days), totaling $22,115.27. If Mr. Burnette is not required to repay the short-term disability benefits he received during the period of the award of temporary total disability benefits, Westrock shall receive an offset for the amount of Short-Term disability benefits paid during the stated period. Westrock and/or its carrier shall pay future

13

temporary total disability benefits until Mr. Burnette attains maximum medical improvement from his compensable injury or receives a release to return to work.

2. Westrock and/or its carrier shall pay all reasonable charges for necessary treatment of Mr. Burnette's compensable injury upon proper presentment of the charges by the treating providers. Westrock and/or its carrier shall promptly communicate authorization to Drs. Watlington and Bannor to provide future reasonable and necessary treatment of Mr. Burnette's compensable injury.

3. The Court will defer until the Compensation Hearing consideration of (1) whether Mr. Burnette is entitled to an award of attorney's fees for his counsel's successful prosecution of this hearing, and (2) whether it should impose penalties on Westrock. However, the Court refers this matter to the Bureau's penalty unit for the assessment of any penalties under the jurisdiction of the Bureau.

4. This matter is set for a Status Hearing at **10:30 a.m. Eastern Time on September 21, 2017**. You must call (615) 741-3061 or toll-free at (855) 747-1721 to participate in the Status Hearing. You must call on the scheduled date/time to participate. Failure to call may result in a determination of the issues without your further participation.

5. **Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3) (2016). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.**

6. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email at WCCompliance.Program@tn.gov or by calling (615) 253-1471 or (615) 532-1309.

**ENTERED this the 26th day of July, 2017.**

_____
**THOMAS WYATT, JUDGE**
Court of Workers' Compensation Claims

14

**APPENDIX:**

<u>Exhibits</u>: The Court admitted the following documents as exhibits during the Expedited Hearing:

1. Written Statement of Dr. J. Harold Helderman;
1A. Written Statement of Dr. J. Harold Helderman showing date of signature (sustained objection due to late-filing, but considered only to determine date of signature);
2. Curriculum Vitae of Dr. J. Harold Helderman;
3. Records of Memorial Hospital;
4. Records of Dr. Philip Bannor;
5. Records of Dr. Joseph Watlington;
6. Walgreen's prescription profile;
7. Job description (admitted for identification purposes only);
8. Wage Statement;
9. Choice of Physician forms;
10. First Report of Injury;
11. Photographs;
12. Notice of Denial (admitted over objection due to lack of authentication on basis of the Court taking judicial notice of the form because it was filed with the DCN);
13. Affidavit of DeWayne Burnette, Sr.;
14. Causation questionnaire signed by Dr. Watlington (overruled objection based on inability to read Dr. Watlington's writing);
15. Causation questionnaire signed by Dr. Bannor (overruled objection based on Dr. Bannor's lack of qualifications due to not being a nephrologist);
16. Redacted records submitted by Mr. Burnette;
17. Updated records of Dr. Banner; and
18. Transcript of recording made by DeWayne Burnette on July 8, 2016 (for identification only based on sustainment of objection due to Mr. Burnette's failure to disclose existence of recording during discovery.)

<u>Technical record</u>: The Court considered the following items in its Expedited Hearing decision:

1. Amended Petition for Benefit Determination;
2. Petition for Benefit Determination;
3. Dispute Certification Notice, including letter from Westrock's counsel adding notice defense;
4. Request for Expedited Hearing;

15

5. Notice of Expedited Hearing;
6. Brief of Second Injury Fund;
7. Employer's Notice of Filing in support of Expedited Hearing brief, including letter from Westrock's counsel dated April 7, 2017;
8. Employer's Expedited Hearing brief;
9. Employer's Witness List;
10. Employee's Expedited Hearing brief;
11. Employee's Notice of Filing of Supplemental Medical Records of Dr. Bannor;
12. Employee's Supplemental Witness List;
13. Responses to Employer's Interrogatories and Request for Production of Documents;
14. Employee's Brief Supporting Admittance of Audio Recording; and
15. Employer's Brief in Support of Oral Motion in Limine to Exclude the July 8, 2016 Audio Recording.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order was sent to the following recipients by the following methods of service on this the 26th day of July, 2017.

| Name | Certified Mail | Via Email | Email Address |
|------|----------------|-----------|---------------|
| Carmen Ware, Employee Attorney | | X | cyware@thewarelawfirm.com |
| Sean Martin, Employer Attorney | | X | swmartin@carrallison.com |
| Ronald McNutt, Second Injury Fund Attorney | | X | Ronald.mcnutt@tn.gov |

PENNY SHRUM, COURT CLERK
wc.courtclerk@tn.gov

16